UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **RENE SAWANIE MERSWIN,** | ) |
| **Plaintiff,** | ) |
| v. | ) Case No. 05-CV-0436-CVE-FHM |
| **THE WILLIAMS COMPANIES, INC.** | ) |
| **Defendant.** | ) |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion for Summary Judgment (Dkt. # 47) and the Motion to Strike Portions of Selected Exhibits from Plaintiff's Summary Judgment Response (Dkt. # 66)[1]. Defendant, The Williams Companies, Inc. ("TWC"), moves for summary judgment on plaintiff's claims of race and national origin discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981 ("Section 1981"). Plaintiff, Rene Sawanie Merswin ("Merswin"), appearing pro se, alleges that defendant limited his promotional opportunities on the basis of his race and/or national origin and retaliated against him as a result of his formal and informal complaints of discrimination. Defendant argues that plaintiff has not set forth a prima facie case of discrimination. Additionally, defendant contends that it had legitimate, nondiscriminatory reasons for its actions and that plaintiff has failed to show that these proffered reasons are, in fact, pretext for illegal

---

[1] The Court did not place substantial weight on the exhibits to which defendant objects. Since the Court grants defendant's motion, the inclusion of the exhibits at issue does not prejudice the defendant. Therefore, the motion is moot.

discrimination. For the reasons set forth below, the Court grants defendant's motion for summary judgment.

**I.**

Merswin is an African-American man who was raised in Suriname. He holds a bachelor of science degree in business administration and a master's degree in business administration. TWC hired Merswin on June 1, 1999 as a Systems Analyst in the Information Technology ("IT") Department. At this time, his supervisor was Alice Ann Hunter. On June 30, 2001, Merswin was promoted to Senior Systems Analyst. According to the TWC job summary for a Senior Systems Analyst, Merswin's job responsibilities included the translation of system requirements into technical design through development testing and implementation in a timely, cost-effective manner. Dkt. # 47, Ex. D, Job Summary. According to plaintiff, his "actual job responsibility" was to provide "project/technical leadership on moderately complex projects" including Remedy and Tele Alert applications. Dkt. # 50, at 12.

On October 21, 2001, Merswin's Performance Evaluation Report indicated that he ranked himself higher than his supervisors, peers, and colleagues with respect to his job skills. Dkt. # 47, Ex. F. Whereas Merwin gave himself the highest score of "4" or "5" in ranking abilities such as leadership competency and integrity competency, other persons reviewing his work gave him average scores ranging from "2" to "4." Some of the comments at the end of the evaluation were negative. For example, one person commented that "Rene can become extremely defensive if he perceives that his competence is being questioned." Id. In a November 4, 2001 email, Merswin implied that the poor results were, in part, due to his manager's discriminatory attitude. In

describing his manager, he wrote, "she has a natural and professional weakness against people of colors." Dkt. # 47, Ex. G.

In 2002, Donna Hall ("Hall") became a manager in the IT Department at TWC; she had supervisory responsibility over Merswin. Dkt. # 47, Ex. E, Hall Affidavit, ¶ 3. At that time, Merswin was already trained in and provided Remedy and Tele Alert support. In 2002 and 2003, plaintiff received excellent performance reviews from Hall. Dkt. # 50, Ex. 21. Hall noted that Merswin had "exceeded expectations." Id. She noted that he had "taken on additional responsibilities of learning the PVCS products" and that he had improved his team skills. Id.

When Hall became manager, she required employees to cross-train "in order to become familiar with different applications to ensure that more than one employee supported each application." Id., ¶ 6. Hall contends that, while she gave each employee the option to select the application on which they would cross-train, "Merswin was the only employee who did not voluntarily select a new application to learn." Id., ¶ 8. However, Merswin claims that he asked to learn the IT Valuation Model application, but Hall refused. Dkt. # 50, at 15. Hall directed Merswin to train on the PVCS Tracker application. Dkt. # 47, Ex. E, ¶ 13. She assigned another employee, Jamie Blodgett ("Blodgett"), to work on the Remedy and Tele Alert applications. Dkt. # 47, Ex. E, ¶ 12. Hall created an Internal Systems Cross Training Worksheet to ensure that at least three employees were trained for each application. The worksheet listed Merswin as trained for the Remedy, PVCS Tracker, and Tele Alert applications. Dkt. # 47, Ex. E, Attachment 1. It listed Blodgett as trained for Remedy, Tele Alert, and IVR applications. Id.

Beginning in June 2003, plaintiff claims that he was subjected to unfavorable discriminatory treatment that created a hostile work environment. He claims that, at that time, someone placed

3

under his chair a box of "old stuff" that belonged to a former colleague who committed suicide in 2000. Dkt. # 50, at 27. While Hall allegedly witnessed this occurrence, she refused to have fingerprints taken of the box to determine who had placed it by plaintiff's chair. Id. Plaintiff also complains of Hall attempting to teach him Oklahoma slang and making comments that he was not an expert in Crystal Reports. Id. In his deposition, he pointed to other incidents that allegedly contributed to a hostile environment. For example, plaintiff related an incident when Hall gave him McDonald's toys for his children and an incident when a co-worker gave him a "full" water bottle that he believed had been tampered with. Dkt. # 47, Ex. U, Merswin Deposition, at 73-76.

On October 20, 2003, Merswin sent a letter to Barbara Kent ("Kent"), the Director of IT Applications, to "share information about [himself], because the desire of one or two people in the Infrastructure group is to end [his] employment at Williams." Dkt. # 47, Ex. I. Merswin met with Kent and told her that he was being discriminated against and that there were people "out to get him." Dkt. # 47, Ex. J.

On March 24, 2004, Merswin met with Linda Garhart ("Garhart"), a Human Resources Business Partner, and complained that Hall took Remedy assignments away from him to make him "vulnerable." Dkt. # 47, Ex. K. Merwin maintains that Hall gave his Remedy assignments to Blodgett and continued to do so after his March 24, 2004 meeting with Garhart. Dkt. # 50, at 56. For example, on April 4, 2004, Hall cancelled a meeting between Merswin and an employee from PeopleSoft group to discuss a Remedy project; on the same day, Merswin saw Blodgett discussing the project with that employee. Id.

On April 9, 2004, Mewswin met with Hall to discuss his job goals. Dkt. # 47, Ex. M. Merswin listed one of his goals to "crosstrain with team members to gain additional knowledge and

4

skills." Id. On the same day, Merswin met again with Garhart to discuss his belief that Hall was trying to "push him out" by assigning Blodgett to train on the Remedy application. Dkt. # 47, Ex. L. In his response to defendant's motion for summary judgment, plaintiff points to other "documented evidence of [his] removal from primary Remedy role." Dkt. # 50, at 57. Specifically, he points to a May 2004 staff list that designated his role in the Remedy group as "secondary" and his role in the PVCS group as "primary." Dkt. # 50, Ex. 15, at 29. Additionally, he notes that Blodgett was given responsibility for training another employee on the Remedy application. Id. at 31. Merswin also contends that, on an undisclosed date, Blodgett accused him of "behaving as if he is above her." Dkt. # 50, Merswin Affidavit, ¶ 13.

Sometime in 2004, TWC employees learned that TWC planned to outsource some of its IT Department to another company. On April 14, 2004, Hall sent an email to various employees, including Merswin, indicating that TWC had "narrowed the field of potential outsourcing providers to one, IBM." Dkt. # 50, at 79. Hall's email quoted Michael Johnson ("Johnson"), TWC Senior Vice President: "From an employee perspective, we see the potential for transitioned employees to have greater future opportunities with IBM." Id.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 27, 2004 alleging race and national origin discrimination. He claimed that he was "transferred to train on other software applications, while my less senior and less experienced non-black co-worker remained assigned to the same application." Dkt. # 47, Ex. N. The same day he sent an email to Johnson, Kent, and Ron Mucci, the Vice President of IT, claiming that he was forced out of Remedy work and required to cross-train on other applications. Dkt. # 47, Ex. O. In his email, Merswin claimed, "I am the Remedy Technical Lead/Architect by

5

responsibility and efforts, but I am not being recognized because of co-workers' discomfort." Id. He maintained that "if was white [sic] and not foreign born, I would at least be recognized by this time as a Systems Analyst Staff." Id. Merswin claimed that he had been moved from primary to secondary role in the Remedy application at a "critical time frame when IBM, the potential outsourcing vendor, may be talking to key application support people." Id. He claimed that Hall moved him to a secondary role "in order to give more visibility to another employee with less Remedy TelAlert experience." Id. Kent responded to Merswin's email on April 28, 2004, stating, "I am disappointed that you continue to believe that the circumstances surrounding the changes in our organization and the cross training taking place in your group is discriminatory . . . . We have tried to explain that the changes in our organization and the cross training efforts are in the best interest of the organization and to your benefit personally." Dkt. # 46, Ex. P. Kent further noted that it was within plaintiff's right to visit with the EEOC. Id.

TWC signed a contract with IBM on June 1, 2004 to outsource most of its IT Department to IBM. TWC outsourced three hundred sixteen (316) out of five hundred fifteen (515) employees in the IT Department to IBM. Dkt. # 47, Ex. R, Nancy Gustine Affidavit, ¶¶ 2, 3. As part of the outsourcing process, TWC provided to IBM a list of Key Provider and Critical Support Personnel ("Key Provider List"). Dkt. # 47, Ex. R, Attachment 1. The Key Provider List included nineteen employees from Tulsa, Oklahoma; Merswin was not included in this list. Id. On June 19, 2004, Merswin sent an email to several TWC managers stating that "IBM Global Services would like to offer me regular employment for support at their Williams account, but IBM decision makers were not given the opportunity to do so." Dkt. # 47, Ex. V.

Plaintiff's employment with TWC terminated as of July 1, 2004, due to the outsourcing of the IT Department to IBM. Dkt. # 47, Ex. S. IBM thereafter offered him short-term supplemental employment as of July 1, 2004. On August 10, 2004, IBM offered plaintiff long-term supplemental employment commencing on August 16, 2004 and continuing for thirteen (13) to twenty-two (22) months. Merswin's employment with IBM ended in March 2005. In connection with the termination, he received a severance package and signed a form releasing IBM from any claims. Dkt. # 47, Ex. X.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th

Cir. 1998). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

### III.

In his second amended complaint (Dkt. # 24), plaintiff alleges that defendant discriminated against him on the basis of his race and national origin in violation of Title VII and Section 1981. He claims that he suffered from an adverse employment action "when Remedy Support assignment was suddenly taken away from him and given to Ms. Jamie Blodgett when she falsely accused the Plaintiff that he 'is behaving as if he is above her.'" Dkt. # 24, ¶ 4a. Plaintiff claims that this constituted "an unlawful discriminatory act by the Defendant in order to limit and segregate the Plaintiff in such a way to deprive him from employment opportunity and adversely affect his status as an employee." Id. Plaintiff continues that, as a result of the discrimination, he was "prevented from becoming a regular employee with IBM when he transitioned as part of the outsourcing contract between Defendant and IBM." Id., ¶ 4b. Additionally, plaintiff contends that defendants created and tolerated a hostile work environment that caused plaintiff emotional pain and suffering. Id., ¶ 4c. Finally, plaintiff contends that defendant "influenced the job transfer process to IBM" as a means of retaliating against plaintiff after his filing a discrimination claim with the EEOC and advising his superiors of alleged discrimination. Id. at 5.

In its motion for summary judgment, defendant interprets plaintiff's complaint to allege, in part, that he was discriminated against as a result of being terminated from TWC and outsourced to

IBM. However, in his response, plaintiff states that he agreed that defendant made "the legitimate decision to outsource most of its IT Department functions and employees to IBM." Dkt. # 50, at 10. Plaintiff does "not challenge the defendant's rights to conduct reductions-in-force, layoffs or outsource of IT Department." Id. at 35. Plaintiff further notes, "the outsourcing to IBM provided a great opportunity for educated and experienced employees such as Plaintiff." Id. at 20. Thus, although his complaint is not clear, plaintiff does not allege that the outsourcing itself constituted an adverse employment action; rather, plaintiff alleges that defendant impermissibly decreased his work on the Remedy application and permitted a non-black employee, namely Blodgett, to work on Remedy projects even though plaintiff was more experienced. This conduct, plaintiff alleges, was retaliatory in nature and was meant to prevent IBM from hiring plaintiff as a full-time, regular employee after the outsourcing. Additionally, plaintiff contends that defendants impermissibly failed to promote him on the basis of his race.

To survive summary judgment on his failure-to-promote and retaliation claims under Title VII and Section 1981, plaintiff must satisfy the McDonnell Douglas burden shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); see also Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (applying the McDonnell Douglas burden-shifting framework to claims under 42 U.S.C. § 1981); Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999) ("While McDonnell Douglas involved a Title VII claim for failure to hire, the analytical framework it pioneered applies equally to claims brought pursuant to section 1981."). First, plaintiff must establish a prima facie case of employment discrimination. McDonnell Douglas, 411 U.S. at 802. In the failure-to-promote context, plaintiff must show that he (1) belongs to a protected class; (2) was qualified for the promotion; (3) was not promoted; and (4) that the position remained open

or was filled with a person in a non-protected class.[2] Amro v. Boeing Co., 232 F.3d 790, 796 (10th Cir. 2000). Plaintiff establishes a prima facie case of retaliation if he shows (1) he engaged in protected opposition to discrimination; (2) he was subject to adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1234. Despite the slight variation depending on the nature of the adverse employment action alleged, "the critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." Id. at 1227 (internal quotations marks and citations omitted). If plaintiff establishes a prima facie case, a presumption of discrimination arises. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

Next, defendant must articulate a legitimate nondiscriminatory reason for the employment decision to rebut the presumption of discrimination. McDonnell Douglas, 411 U.S. at 803; Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 (1981); English v. Colorado Dept. of Corrections, 248 F.3d 1002, 1009 (10th Cir. 2001). At this stage, defendant need not rebut evidence established under the first step; it must only rebut the inference that it acted out of discriminatory animus. E.E.O.C. v. Flasher Co., Inc., 986 F.2d 1312, 1318 (10th Cir. 1992). The ultimate burden of proving discrimination remains at all times on plaintiff. Burdine, 450 U.S. at 253. If defendant carries its burden of production, the presumption of discrimination drops out of the case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

---

[2] This Court recognizes that the Tenth Circuit cases "have sometimes articulated the prima facie case differently, particularly as to the fourth prong and whether it requires the plaintiff to show that the person promoted was outside of the protected class to which the plaintiff belongs." Jaramillo v. Colorado Judicial Dep't, 427 F.3d 1303, 1307 n.1 (10th Cir. 2005).

Finally, the burden shifts back to plaintiff to show that defendant's stated nondiscriminatory reason is mere pretext for unlawful discrimination. Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004). To show pretext, plaintiff must produce evidence that would, if believed by the trier of fact, show that the true reason for the action was discriminatory. Plaintiff can produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).

Here, plaintiff fails to establish a prima facie case that defendant failed to promote him on the basis of his race and/or national origin. Plaintiff contends that, given his 2002 and 2003 performance reports, he should have been promoted to the "Systems Analyst Staff grade level 22 or higher." Dkt. # 50, at 36. However, there is no evidence that the position to which plaintiff refers was open, that defendant sought to promote any employee to that position, or that plaintiff applied to that position. Plaintiff does not contend that another employee was impermissibly promoted to Systems Analyst Staff instead of plaintiff; rather, he merely argues that, given his experience and performance results, he should have been promoted to that position. Merely because plaintiff received good performance reports for two years does not mean that he is entitled to a promotion, however.[3] His allegations, unsupported by any evidence that defendant sought to fill or promote any employee to Systems Analyst Staff or that plaintiff applied for that position, are insufficient to establish a prima facie case of discrimination.

---

[3] In fact, given plaintiff's relatively poor evaluations in 2001, there may have been good reason to deny him a promotion, even if the position of Systems Analyst Staff were open.

Linked to his failure-to-promote claim, plaintiff argues that defendant discriminated against him on account of his race because defendant gave a white employee, namely Blodgett, the lead position with respect to the Remedy application. Plaintiff argues that "Defendant segregated the Plaintiff in such a way to deprive him from leadership and employment opportunities" and "disciplined [plaintiff] . . . with a so-called 'accelerated' cross-training." Dkt. # 50, at 42. Specifically, plaintiff was "forced" to cross-train under the PVCS Tracker application "in order to double time that Plaintiff would spend on PVCS security related emails and requests in order for him to spend less time on Remedy Support efforts." Id. at 29. By undergoing this accelerated PVCS training, plaintiff contends that he was pulled away from what he perceived to be the more desirable Remedy work. At the same time, defendant permitted Blodgett to work on Remedy-related projects.

The Court is perplexed by plaintiff's argument. Whereas most claims concerning discrimination in training hinge on a plaintiff's failure to receive training to the same extent as members of non-protected classes, here, plaintiff contends that the receipt of PVCS training was discriminatory. Plaintiff implies that, if he had been permitted to focus solely on the Remedy application rather than learning the PVCS Tracker application, he would have been more valuable to IBM or would have been "flagged" on the Key Provider List. Plaintiff's argument is purely conjectural. There is absolutely no evidence that, had plaintiff not been trained in PVCS and permitted to work solely on Remedy and Tele Alert, TWC would have included plaintiff on the Key Provider List or that IBM would have retained him as a regular employee. Surely plaintiff cannot contend that defendant was under an obligation to ensure that he was the only employee trained in Remedy so as to increase his value to either TWC or IBM; such a notion is contrary to any rational business practice. Moreover, it is illogical to assume that plaintiff's <u>additional</u> training in PVCS

Tracker somehow put him at a disadvantage with respect to his position at either TWC or IBM. In fact, the evidence clearly indicates that the opposite is true. In his 2003 performance report, Hall noted, "Rene has also stepped up to the plate to take on additional responsibilities, such as learning [PVCS] Tracker. Exceptional feedback was received from the Tracker customers on how Rene managed the support while Mike Wolters was out of town for several weeks." Dkt. # 50, Ex. 21, at 19. TWC clearly and logically viewed training and proficiency in multiple applications as an asset, not a detriment.

Plaintiff has also failed to show that he was treated differently than other employees. TWC required each employee in the IT Department to train in multiple applications. Even Blodgett, the employee to whom plaintiff frequently points to show differential treatment, was trained in multiple applications. Plaintiff contends, however, that Blodgett was "promoted" to the primary Remedy technician, and he was relegated to the secondary position. As evidence, he points to a computer staff list that states his role as "secondary" with respect to the Remedy group. Dkt. #47, Ex. 15. Also, plaintiff points to an email from Blodgett where Blodgett informed plaintiff that she had trained another employee, Dea Dildine ("Dildine"), on the Remedy application and requested that plaintiff provide Dildine with "more advance [sic] cross-training." Id. Finally, he argues that Blodgett was treated more favorably than plaintiff because Hall moved plaintiff's one-on-one meetings from Mondays to Thursdays and kept Blodgett's meetings on Mondays. Dkt. # 50, at 28. It is unclear how Blodgett's email or Hall's decision to meet with plaintiff on Thursdays instead of Mondays provide any support for plaintiff's argument. Also, the mere fact that plaintiff was listed as "secondary" instead of "primary" with respect to the Remedy application is insufficient to establish a prima facie case of discrimination. According to the Tenth Circuit, "a mere

inconvenience or an alternation of job responsibilities" is not an adverse employment action sufficient to establish a prima facie case. Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (1998).

Moreover, even assuming arguendo that plaintiff established a prima facie case of discrimination based on the training system, defendant has set forth a legitimate, nondiscriminatory reason for its employment action.  Plaintiff argues that defendant discriminated against him by "forcing" him to cross-train in PVCS and permitting Blodgett to work on the Remedy application. However, defendant notes that the reason for this policy was "to ensure that more than one employee supported each application." Dkt. # 50, Ex. E, Hall Affidavit, ¶ 6.  Plaintiff was assigned to PVCS training because he was already trained in Remedy and Tele Alert.  Likewise, Hall assigned Blodgett as an additional employee to support the Remedy application. Id., ¶ 10.  Hall's Internal Systems Cross Training Worksheet is evidence of the company's policy of ensuring that multiple employees were trained on each application.  Dkt. # 50, Ex. E, Attachment 1.  The worksheet listed at least three employees who were responsible for each application. Id.  With respect to Remedy, plaintiff, Blodgett, and Dildine were listed.  Id.   Defendant clearly had a rational and nondiscriminatory reason for cross-training.  By cross-training, defendant ensured that multiple employees were proficient with respect to each application such that work would not be compromised in case of an employee's absence.  Indeed, plaintiff was assigned to undergo "accelerated" training in the PVCS Tracker application because the primary employee responsible for that application was absent for a substantial period of time due to a disability.  Therefore, defendant's reason for requiring plaintiff to expand his knowledge beyond Remedy and Tele Alert was legitimate and nondiscriminatory.

Plaintiff argues that the cross-training worksheet and defendant's policy of cross-training is mere pretext for unlawful race and national origin discrimination. He claims that the Internal Systems Cross Training Worksheet "was used to take work assignments away from Plaintiff." Dkt. # 50, at 16. Additionally, plaintiff states: "As an employee who holds MBA degree and he can distinguish a learning opportunity from abuse or pretext [sic]." Dkt. # 50, at 18. Plaintiff fails to provide any evidence to support these allegations of pretext. Mere assertions of pretext, without evidence, are insufficient to create a genuine issue of material fact. Celotex, 477 U.S. at 324; Shapolia v. Los Alamos National Laboratory, 992 F.2d 1033, 1039 (10th Cir. 1993) (noting that the plaintiff's mere assertions and own assessment of his job performance were inadequate to raise an issue of fact for trial with respect to pretext in a Title VII case).

In addition, the Court determines that defendant is entitled to summary judgment on plaintiff's retaliation claim because plaintiff has failed to establish a prima facie case of discriminatory retaliation. While plaintiff engaged in a protected activity by filing a complaint with the EEOC on April 27, 2004, plaintiff has not shown that he was subject to adverse employment action as a result of the protected activity. With respect to his retaliation claim, plaintiff points to much of the same evidence as described above. He argues that key Remedy assignments were taken from him and given to Blodgett and that he was "disciplined by Defendant with a so-called 'accelerated' cross-training for PVCS Tracker as a back-up support person, in light of looming outsourcing, in retaliation for opposing discrimination." Dkt. # 50, at 46. For the same reasons as set forth above, the Court determines that the defendant's conduct in assigning Blodgett some Remedy work and training plaintiff in the PVCS Tracker application did not constitute an adverse employment action sufficient to establish a claim of retaliation.

Additionally, as in his failure-to-promote claim, plaintiff points to the fact that TWC did not include plaintiff's name on the Key Provider List.  Plaintiff alleges that this action led directly to IBM's decision to terminate plaintiff in March 2005.  Plaintiff contends that "plaintiff suffered materially when Defendant had identified Ms. Blodgett and Ms. Fairchild as Key Contributors for Remedy instead of Plaintiff who had proven himself over five years as a senior Remedy Systems Analyst."   Dkt. # 50, at 46.  However, the Court notes that neither Blodgett nor Fairchild was included on the Key Provider List.  Dkt. # 47, Ex. R, Attachment 2.  Thus, it is unclear why plaintiff contends that TWC treated plaintiff differently from similarly situated employees, such as Blodgett, who were later retained by IBM.  Ultimately, plaintiff provides no evidence, other than his personal views concerning his skills, that TWC should have included him on the Key Provider List or that TWC's exclusion from that list was due to racial animus.

Finally, plaintiff provides no evidence that TWC's conduct was in any way causally connected to IBM's decision to terminate him in March 2005.  In the case of a retaliation claim, "[t]he causal connection may be shown by producing evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1320 (10th Cir. 1999) (implicitly overruled by National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), on other grounds); see Kendrick, 220 F.3d at 1234.  Here, plaintiff contends that "defendant began to systematically retaliate against Plaintiff after he met on July 8, 2003 with a senior vice president and voiced his concerns regarding opportunities for minorities at Williams."  Dkt. # 50, at 47.  He filed his EEOC complaint on April 27, 2004.  There is no evidence that, following this conduct, TWC engaged in any conduct that would persuade IBM to terminate plaintiff because of his race, national origin, or as a result of his

16

protected conduct. On the contrary, IBM offered plaintiff short-term supplemental employment as of July 1, 2004; thus his employment was uninterrupted after the outsourcing. IBM even offered plaintiff long-term employment commencing on August 2004. There is no evidence that plaintiff's ultimate termination from IBM in March 2005 was in any way linked to TWC's conduct or his protected activities in 2003 and 2004. Thus, plaintiff fails to establish a prima facie case of retaliation; defendant is entitled to summary judgment on that claim.

To the extent that plaintiff brings a claim for hostile work environment,[4] the Court grants summary judgment on that claim as well. "Although hostile work environment is not explicitly mentioned in Title VII, it is well established a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to 42 U.S.C. § 2000e-2(a)(1)." Bolden v. PRC, Inc., 43 F.3d 545, 550 (10th Cir. 1994). To constitute actionable harassment, the conduct must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (internal quotation marks and citations omitted); see also Bolden, 43 F.3d at 550. Additionally, plaintiff must show that "the harassment was racial or stemmed from racial animus. General harassment if not racial or sexual is not actionable." Bolden, 43 F.3d at 500. Plaintiff must show "more than a few isolated incidents of racial enmity." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1412 (10 Cir. 1987); Bolden, 43 F.3d at 550.

---

[4]   It is unclear whether plaintiff brings a claim on the basis of a hostile work environment. In his response to defendant's motion for summary judgment, plaintiff states that he "has not made a separate claim for a hostile work environment from his discrimination and retaliation claims." Dkt. # 50, at 36. However, plaintiff makes repeated references to a hostile work environment.

Here, plaintiff point to a few incidents that allegedly indicate a hostile environment and provide circumstantial evidence of racial discrimination. For example, the plaintiff recites an anecdote where a co-worker gave him a water bottle that was filled all the way to the top. Dkt. # 50, Ex. U, at 170-75. Also, plaintiff states that Hall gave plaintiff a bag of McDonald's toys for his five children and that she tried to teach him Oklahoma slang. Id. at 118-23, 138-39. Finally, plaintiff points to an email that Hall forwarded to plaintiff and other employees reciting a story about Eddie Murphy and Michael Jordan. Dkt. # 47, Ex. Y. The Court fails to see how the first several anecdotes created a hostile environment or relate in any way to racial animus. With respect to the Eddie Murphy and Michael Jordan email, the Court determines that this did not create a racially hostile environment. While the email does concern race, it does not portray African-Americans in a negative light. In fact, the email, albeit light-hearted, highlights the problems associated with racial stereotypes. It is certainly possible that plaintiff felt uncomfortable as a result of this email; however, as a matter of law, plaintiff's subjective belief is insufficient to establish a claim for a racially hostile environment. Thus, plaintiff has failed to establish a genuine issue of material fact with respect to the allegedly racially hostile environment. Defendant is entitled to summary judgment on that claim.

To the extent that plaintiff merely points to these anecdotes to support his claims of discrimination in promotional opportunities and retaliation, the Court finds that these anecdotes do not alter its above analysis. These anecdotes are not circumstantial evidence of either discriminatory failure-to-promote or retaliation.

**IV.**

The Court finds that plaintiff has failed to establish a prima facie case of race or national origin discrimination, both with respect to his failure-to-promote and retaliation claims. Plaintiff also fails to establish a genuine issue of material fact with respect to a hostile work environment. Therefore, defendant is entitled to summary judgment on all of plaintiff's Title VII and Section 1981 claims.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. # 47) is **granted**, and the Motion to Strike Portions of Selected Exhibits from Plaintiff's Summary Judgment Response (Dkt. # 66) is **moot**. A separate judgment is entered herewith.

**DATED** this 4th day of December, 2006.

*[Signature]*
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT